# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| **MICHAEL F. CONFER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 1:05 CV 93 CDP (LMB)** |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying the application of Michael F. Confer for Disability Insurance Benefits under Title II of the

Social Security Act and Supplemental Security Income benefits under Title XVI of the Act. The

cause was referred to the undersigned United States Magistrate Judge for a Report and

Recommendation pursuant to 28 U.S.C. § 636 (b). Plaintiff has filed a Brief in Support of

Complaint. (Document Number 15). Defendant has filed a Brief in Support of the Answer.

(Doc. No. 16).

## Procedural History

On February 26, 2003, plaintiff filed his applications for Disability Insurance Benefits and

Supplemental Security Income, claiming that he became unable to work due to his disabling

condition on December 31, 1998. (Tr. 42-44, 336-338). Plaintiff's applications were denied

initially, and following an administrative hearing, plaintiff's claims were denied in a written

opinion by an Administrative Law Judge (ALJ), dated December 10, 2004. (Tr. 35-40, 335, 339-42, 14-23). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on April 27, 2005. (Tr. 9, 5-7). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481 (2003).

## Evidence Before the ALJ

### A.  ALJ Hearing

Plaintiff's administrative hearing was held on September 20, 2004. (Tr. 346). Plaintiff was present and unrepresented. (Tr. 348). The ALJ began by informing plaintiff of his right to be represented by counsel at the hearing. (Id.). Plaintiff indicated that he understood his rights and wished to waive his right to counsel. (Id.). The ALJ admitted a number of exhibits into evidence and stated that he would hold the record open for thirty days to allow plaintiff to submit additional medical records. (Tr. 349).

The ALJ then examined plaintiff, who testified that he was born on June 5, 1957, and has a high school diploma. (Tr. 350-51). Plaintiff stated that he received some technical training. (Tr. 351). Plaintiff testified that he became unable to work in December of 1998. (Id.). Plaintiff stated that he was involved in an automobile accident in 2002. (Id.). Plaintiff testified that he has experienced back problems since 1995, which caused him to become unable to work. (Id.). Plaintiff explained that he is missing a disc in his lower back and he has degenerative disc disease.[1] (Id.). Plaintiff stated that at his last job he worked for a propane company delivering gas and doing maintenance. (Id.). Plaintiff testified that before 1988, he was a plastics worker. (Id.).

[1]Degenerative changes in the spine, which results in back pain. See Stedman's Medical Dictionary, 467 (27th Ed. 2000).

Plaintiff stated that he is not married and he has one daughter. (Tr. 352). Plaintiff testified that he currently lives alone, although he lived with his father until his father died in 2000. (Id.).

Plaintiff stated that he is unable to work because he injured his back in the automobile accident. (Id.). Plaintiff testified that two discs were removed from his lower back and a metal plate and screws were inserted to replace the discs. (Id.). Plaintiff stated that he does not have full range of motion in his neck. (Id.). Plaintiff testified that he also has shooting pains down his leg. (Tr. 353). Plaintiff stated that he takes Naprosyn[2] for the pain, which sometimes provides relief and sometimes does not provide relief. (Id.).

Plaintiff testified that he is able to move around the house to cook and clean. (Id.). Plaintiff stated that he cannot sit and watch television because he has difficulty concentrating due to his depression. (Id.). Plaintiff testified that he has a driver's license, and is able to drive short distances. (Tr. 353-54). Plaintiff stated that when he tries to do too much, he experiences pain and has to sit down on a heating pad. (Tr. 354). Plaintiff testified that he has good days and bad days. (Id.). Plaintiff stated that in a thirty day period he has about ten good days. (Id.). Plaintiff testified that on a bad day, he applies ice and prescription cream and sits on a heating pad. (Id.). Plaintiff stated that his doctor at the VA told him to lie down on a heating pad. (Id.).

Plaintiff testified that he experiences difficulty walking and must use a walker. (Tr. 355). Plaintiff stated that he could probably sit down for twenty minutes and work on a computer.

---

[2]Naprosyn is a non-steroidal anti-inflammatory drug indicated for the treatment of arthritis. See Physician's Desk Reference (PDR), 2874 (59th Ed. 2005).

(Id.).  Plaintiff testified that he takes Lithium,[3] Celexa,[4] Cyclobenzaprine,[5] Naprosyn, and

Trazodone[6] daily.  (Tr. 356).  Plaintiff stated that his medications work but he has "down days,"

where he is depressed for three to four days at a time.  (Id.).  Plaintiff testified that he sees a

psychologist and a psychiatrist at the VA for his depression.  (Id.).

The ALJ then examined the vocational expert, Michael Lala.  (Tr. 357).  The ALJ asked

Mr. Lala whether a hypothetical individual who is 47 years old, has a high school education, who

is limited to occasional balancing, stooping, kneeling, crouching, and crawling; and has a mild

limitation in attention, concentration, understanding, and memory could perform any work.  (Id.).

Mr. Lala testified that such an individual could perform light, unskilled work.  (Tr. 358).

Plaintiff indicated that he did not have any questions for the vocational expert.  (Tr. 359).

The ALJ allowed plaintiff two weeks to obtain additional medical records.  (Id.).

### B.     Relevant Medical Records

The record reveals that plaintiff was taken to St. Francis Medical Center by ambulance on

February 26, 1999, after inhaling car fumes while working on his car.  (Tr. 206).  Plaintiff denied

any suicidal intention or ideation.  (Id.).  Plaintiff was treated and was discharged with the

recommendation that he stop smoking, and stop working in an enclosed area with a running

---

[3]Lithium is indicated in the treatment of manic episodes of manic-depressive illness.  See PDR at 1485.

[4]Celexa is indicated for the treatment of depression.  See PDR at 1270.

[5]Cyclobenzaprine is indicated for the relief of muscle spasm associated with acute, painful musculoskeletal conditions.  See PDR at 1931.

[6]Trazodone is indicated for the treatment of depression.  See PDR at 3266.

internal combustion engine.  (Tr. 208).

On March 29, 1999, plaintiff presented to Southeast Missouri Hospital complaining of stomach pain and side pain after drinking excessive amounts of alcohol.  (Tr. 159).  Abdominal x-rays were unremarkable.  (Tr. 160-61).  Plaintiff was diagnosed with acute alcohol abuse.  (Tr. 160).  Plaintiff was discharged, and was encouraged to obtain treatment at the Gibson Center.  (Id.).

On October 20, 1999, plaintiff was admitted at Southeast Missouri Hospital after his father received a letter that was perceived as being a suicide note.  (Tr. 155).  Plaintiff stated that his father misconstrued the letter and plaintiff denied any suicidal ideation, intent, or plan.  (Id.).  Plaintiff denied any prior history of suicide attempts or treatment for depression.  (Id.).  John Thadeus Lake, M.D. diagnosed plaintiff with adjustment disorder[7] with depressed mood; rule out alcohol abuse.  (Tr. 156).  Dr. Lake noted that plaintiff had moderate financial, transportation, and housing stressors.  (Tr. 157).  Plaintiff was assessed a Global Assessment of Functioning (GAF)[8] of 50[9] on admission and 60[10] on discharge.  (Id.).  Dr. Lake found that plaintiff was having some

_____

[7]The essential feature of this mental disorder is a maladaptive reaction to an identifiable psychological stressor or stressors, that occurs within weeks of the onset of the stressors and persists for up to six months.  The nature of the reaction is indicated by impairment in occupational functioning or in usual social activities or relationships with others, or with symptoms that are in excess of a normal or expectable reaction to the stressor.  See Stedman's at 525.

[8]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations."  Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[9]A GAF score of 41 to 50 denotes "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or

difficulty with recent psychosocial stressors, however, he did not appear to be at risk for harm to himself. (Id.). Dr. Lake expressed the opinion that plaintiff would benefit from some ongoing therapy. (Id.). He noted that plaintiff agreed to follow-up at the Marble Hill Community Counseling Center. (Id.). Plaintiff was discharged on October 21, 1999, with no medications and no restrictions in diet or activity. (Id.).

Plaintiff was seen at the Community Counseling Center on November 1, 1999. (Tr. 88). Plaintiff talked about life stressors that led to his psychiatric admission. (Id.). Plaintiff denied suicidal thoughts and stated that he does not feel that he needs help. (Id.).

The record reveals that plaintiff received treatment at John Pershing VA Medical Center for various impairments, including depression, neck pain, leg pain, back pain, and hand numbness, from September 2000 to September 2004. (Tr. 259-334). On September 2, 2000, plaintiff complained of chronic back pain. (Tr. 283).

Plaintiff was admitted to Southeast Missouri Mental Health Center on January 22, 2001, under a 96-hour court order form the Bollinger County Jail. (Tr. 144). Plaintiff reported that he had been drinking heavily for twenty years. (Id.). Plaintiff admitted to suicidal thoughts. (Tr. 145). Praveen Nimmagadda, M.D. diagnosed plaintiff with alcohol dependence; alcohol intoxication, in remission; and uncomplicated grief.[11] (Tr. 146). Plaintiff was discharged on

school functioning (e.g., no friends, unable to keep a job)." DSM-IV at 32.

[10]A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 32.

[11]A normal emotional response to an external loss; distinguished from a depressive disorder since it usually subsides after a reasonable time. Stedman's at 771.

January 26, 2001, at which time Dr. Nimmagadda assessed a GAF of 70.[12] (Id.). Dr.

Nimmagadda stated that plaintiff was "doing well," was psychiatrically stable, and "has developed

insight into his problems, including alcohol," at the time of his discharge. (Id.). Dr.

Nimmagadda noted that plaintiff was going to start looking for a job. (Id.). Dr. Nimmagadda

recommended that plaintiff follow-up at Gibson Center for substance abuse counseling. (Id.).

On August 2, 2001, plaintiff presented to the VA Medical Center for therapy. (Tr. 280).

Marilyn J. Jansen, Ph.D., diagnosed plaintiff with recurrent major depression[13] and assessed a

GAF of 60. (Id.). Dr. Jansen expressed the opinion that plaintiff's depression was disabling, in

that it was preventing him from obtaining and maintaining gainful employment. (Tr. 281). Dr.

Jansen recommended that plaintiff continue taking Celexa and Trazodone. (Tr. 280). On

September 28, 2001, plaintiff presented to Dr. Jansen with a depressed mood. (Tr. 279). Plaintiff

admitted to suicidal ideation but denied a plan. (Id.). Dr. Jansen assessed a GAF of 60. (Id.).

Dr. Jansen increased plaintiff's dosages of Celexa and Trazodone. (Id.).

On May 8, 2002, plaintiff presented to Southeast Missouri Hospital complaining of right

ankle pain after sustaining a fall. (Tr. 106). It was noted that plaintiff fell when he lost his

---

[12]A GAF score of 61-70 denotes "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 32.

[13]A mental disorder characterized by sustained depression of mood, anhedonia, sleep and appetite disturbances, and feelings of worthlessness, guilt, and hopelessness. Diagnostic criteria for a major depressive episode include a depressed mood, a marked reduction of interest or pleasure in virtually all activities, or both, lasting for at least 2 weeks. In addition, 3 or more of the following must be present: gain or loss of weight, increased or decreased sleep, increased or decreased level of psychomotor activity, fatigue, feelings of guilt or worthlessness, diminished ability to concentrate, and recurring thoughts of death or suicide. Stedman's at 478.

balance while kicking a truck. (Id.). Plaintiff was diagnosed with a right ankle fracture, head injury and laceration, and alcohol intoxication. (Tr. 107). Imaging of the cervical spine revealed degenerative disc disease at C[14]5-6 and C6-7.[15] (Tr. 102). Plaintiff underwent open reduction of the right ankle without complication. (Tr. 100).

On July 12, 2002, plaintiff was admitted to Southeast Missouri Hospital for being suicidal. (Tr. 136). Plaintiff reported drinking heavily for the past two weeks and stated that he did not want to live. (Id.). Plaintiff indicated that he had been experiencing significant problems since his father died in November of 2000. (Id.). Plaintiff was diagnosed with major depression, suicide ideations, alcoholism, and transient hives following thiamine. (Tr. 137). Plaintiff experienced seizures and hallucinations due to alcohol withdrawal syndrome. (Tr. 129-30). Plaintiff was stabilized in the Intensive Care Unit and was transferred back to the Psychiatric Unit. (Tr. 118). Dr. Lake stated that plaintiff was initially "quite despondent and depressed," but "improved steadily," after attending group therapy. (Id.). Plaintiff was no longer feeling hopeless or helpless and no longer voicing suicidal ideation intent or plan. (Id.). Plaintiff was prescribed Celexa and Trazodone, and was discharged on July 24, 2002, with no restriction of diet or activity. (Tr. 118-19). Dr. Lake assessed a GAF of 35[16] on admission and 60 upon discharge. (Tr. 119).

---

[14]Abbreviation for cervical vertebra (C1-C7). Stedman's at 265.

[15]The back is comprised of the cervical, thoracic and lumbar regions. In common terms, the cervical region of the spinal column is the neck; the thoracic region is the main part of the back; and the lumbar region is the lower back. There are seven cervical vertebrae, twelve thoracic vertebrae, and five lumbar vertebrae. The sacrum lies directly below the fifth lumbar vertebra. The coccyx, or tail bone, lies below the sacrum. See J. Stanley McQuade, Medical Information Systems for Lawyers, § 6:27 (1993).

[16]A GAF score of 31 to 40 denotes "[s]ome impairments in reality testing or communication (e.g. speech is at times illogical, obscure, or irrelevant) OR major impairment in

Plaintiff presented to Saint Francis Medical Center by ambulance on July 24, 2002, after being involved in an automobile accident. (Tr. 203). Plaintiff underwent imaging of the cervical spine, which revealed a fracture through the ring of C5 in four locations, and mild degenerative changes at the C5-6 and C6-7 levels. (Tr. 187). Plaintiff was placed in a halo device. (Tr. 190).

Plaintiff saw David G. Yingling, M.D. for a neurosurgical consultation on July 24, 2002. (Tr. 233). Dr. Yingling's impression was comminuted C5 fracture, neurologically intact. (Id.).

On August 3, 2002, Dr. Yingling performed an anterior discectomy[17] with fusion at C4-5 and C5-6 and plating at C4 through C6. (Tr. 177, 229). Plaintiff tolerated the procedure well. (Tr. 230).

Plaintiff saw Dr. Yingling on August 27, 2002, at which time plaintiff reported that he was "doing well." (Tr. 225). Dr. Yingling's impression was plaintiff is doing well three weeks after his anterior two level fusion and plating. (Id.). On September 17, 2002, plaintiff reported that he was doing "reasonably well." (Tr. 23). Plaintiff stated that he fell and was seen in the Emergency Room on September 7, 2002. (Id.). Dr. Yingling's impression was plaintiff is doing well with his cervical fusion and halo. (Id.). On October 8, 2002, plaintiff reported that he was doing well and that he was not having much pain except for a day or two after the pins are tightened. (Tr. 221). Dr. Yingling's impression was plaintiff is doing well with his halo and vest. (Id.). On November 5, 2002, Dr. Yingling's impression was that plaintiff's x-ray looks good and his halo pins appear to have loosened and shifted. (Tr. 220). On December 10, 2002, plaintiff reported that he was

---

several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up other children, is defiant at home, and is failing at school)." DSM-IV at 32.

[17]Excision of an intervertebral disk. See Stedman's at 508.

doing reasonably well. (Tr. 219). Upon physical examination, Dr. Yingling found that plaintiff had "somewhat limited range of motion of his neck particularly in extension and he has good strength in his extremities." (Id.). Dr. Yingling's impression was that plaintiff is doing well although he continues to have some muscular stiffness and spasm. (Id.). On January 21, 2003, plaintiff reported that he was doing reasonably well, although he still experiences some stiffness in his neck occasionally. (Tr. 216). Dr. Yingling's impression was that plaintiff was doing well in terms of his cervical injury but was having problems with pain in his right wrist, due to sustaining a fall at home. (Id.).

Dana Taylor, a state agency medical consultant, completed a Physical Residual Functional Capacity Assessment on March 13, 2003. (Tr. 238-45). Ms. Taylor expressed the opinion that plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand or walk about six hours in an eight-hour workday, sit about six hours in an eight-hour workday, and push or pull an unlimited amount of time. (Tr. 239). Ms. Taylor found that plaintiff had no postural, manipulative, visual, communicative, or environmental limitations. (Tr. 240-42).

Marsha J. Toll, Psy. D., a state agency medical consultant, completed a Psychiatric Review Technique on March 13, 2003. (Tr. 247-58). Dr. Toll expressed the opinion that plaintiff suffered from non-severe depression and alcohol dependence. (Tr. 247). Dr. Toll found that plaintiff's impairments cause mild limitations in plaintiff's activities of daily living; ability to maintain social functioning; and ability to maintain concentration, persistence, or pace. (Tr. 255). Dr. Toll stated that plaintiff has experienced one or two episodes of decompensation. (Id.).

Plaintiff saw Teresa Neira, M.D., at the VA Medical Center on May 7, 2003. (Tr. 277). Dr. Neira noted that plaintiff had a history of depression and that he stopped treatment six months

ago.  (Id.).  Plaintiff reported that his symptoms of depression have worsened since he stopped taking his medications.  (Id.).  Dr. Neira's diagnosis was recurring major depression.  (Id.).  Dr. Neira referred plaintiff to psychotherapy and prescribed Celexa, Trazodone and Bu Spar.[18]  (Id.).  Plaintiff saw Dr. Neira on May 14, 2003, for a follow-up.  (Tr. 276).  Dr. Neira noted that plaintiff was tolerating his medications well and was feeling better.  (Id.).  Dr. Neira's diagnosis was major depression, responding well to treatment.  (Id.).  Dr. Neira increased plaintiff's dosage of Trazodone.  (Id.).

Plaintiff presented to the VA Medical Center on June 26, 2003 complaining of neck pain and numbness on both upper extremity.  (Tr. 275).  Plaintiff was prescribed Naprosyn and was advised to use a soft cervical collar when he experiences neck strain.  (Tr. 276).

Plaintiff saw Donna Lynn Parkinson, Ph.D., at the VA Medical Center for a psychiatric consultation on June 26, 2003.  (Tr. 266).  Dr. Parkinson found that plaintiff had a mildly dysphoric mood.  (Id.).  Dr. Parkinson recommended that plaintiff meet with State Vocational Rehabilitation for an assessment to determine jobs skills he has.  (Tr. 267).  Plaintiff indicated that he would look into seeking other employment.  (Id.).  Plaintiff stated that his main stressor was his disability claim.  (Id.).

Plaintiff saw Dr. Parkinson for therapy on October 2, 2003.  (Tr. 269).  Dr. Parkinson noted that plaintiff did not contact State Vocational Rehabilitation as she had recommended.  (Id.).  Plaintiff indicated that he was dealing better with his grief over his father's death.  (Id.).

---

[18]BuSpar is indicated for the treatment of anxiety.  See PDR at 2578.

Dr. Parkinson's diagnosis was depressive disorder and personality disorder.[19]  (Tr. 270).  Plaintiff also saw Dr. Neira on October 2, 2003.  (Tr. 268).  Dr. Neira found that plaintiff's symptoms of depression were improving under his current treatment.  (Id.).  Plaintiff reported that he was attending functions with neighbors and friends and was participating in church activities.  (Id.).  Dr. Neira increased plaintiff's medications due to the impending anniversary of plaintiff's father's death.  (Tr. 269).

Plaintiff saw Dr. Neira for a psychiatric follow-up on October 17, 2003.  Plaintiff reported that he was feeling better and was less depressed.  (Id.).  Plaintiff stated that he was having more good days than bad days.  (Id.).  Dr. Neira noted that plaintiff was responding very well to the latest increase in his medication, and that he was attending social activities at his church.  (Id.).  Plaintiff denied suicidal plans.  (Id.).  Dr. Neira's diagnosis was major depression improving.  (Id.).

Plaintiff saw Dr. Parkinson for therapy on November 18, 2003.  (Tr. 331).  Plaintiff reported that he has been doing "really bad" the past three weeks.  (Id.).  Plaintiff stated that he has been trying to contact State Vocational Rehabilitation to obtain employment.  (Id.).  Plaintiff also indicated that he is still grieving over the death of his father.  (Id.).  Dr. Parkinson discussed with plaintiff ways to cope with the feelings he is experiencing.  (Id.).

Plaintiff presented to the VA Medical Center on December 2, 2003, complaining of low back pain and right leg pain.  (Tr. 328).  The assessment of Linda J. Gillespie, RN, was neck pain,

---

[19]General term for a group of behavioral disorders characterized by usually lifelong ingrained maladaptive patterns of subjective internal experience and deviant behavior, lifestyle, and social adjustment, which patterns may manifest in impaired judgment, affect, impulse control and interpersonal functioning.  Stedman's at 527.

low back pain, right leg pain, and tobacco dependence.  (Tr. 330).  Nurse Gillespie recommended x-rays of the lumbar spine be obtained.  (Id.).

Plaintiff presented to the VA Medical Center on December 31, 2003, complaining of low back pain that radiates down his left lower extremity.  (Tr. 322).  The impression of Sheikh Sadiq, M.D., was "negative physical and neuromuscular exam."  (Tr. 320).  Dr. Sadiq expressed the opinion that plaintiff's symptoms were related to anxiety and "his desire to be declared disabled."  (Id.).  Dr. Sadiq stated that a CT scan of the lumbosacral spine plaintiff underwent on this date was "entirely negative."  (Id.).

Plaintiff saw Jerry L. Wessel, M.D. at the VA Medical Center on January 9, 2003.  (Tr. 317).  Plaintiff reported feeling very depressed and experiencing mood swings.  (Id.).  Plaintiff was not suicidal.  (Id.).  Dr. Wessel's diagnosis was possible bipolar disorder[20] with major depression.  (Id.).  Dr. Wessel started plaintiff on Lithium.  (Tr. 318).  Plaintiff also saw Dr. Parkinson for therapy on this date.  (Tr. 316).  Dr. Parkinson noted that plaintiff was "very disgruntled with the Social Security disability claims process."  (Id.).  Plaintiff indicated that he could not participate in any Vocational Rehabilitation program due to a lack of transportation.  (Id.).  Plaintiff stated that he does not have a license and must complete a program with the State before his license is reinstated.  (Id.).  Plaintiff reported that he attended some social functions with neighbors during the holidays and enjoyed himself.  (Id.).

On February 4, 2004, plaintiff saw Dr. Wessel for a psychiatric follow-up.  (Tr. 315).  Plaintiff reported that he was feeling a lot better since starting the Lithium.  (Id.).  Plaintiff

---

[20]An affective disorder characterized by the occurrence of alternating periods of euphoria and depression.  Stedman's at 526.

indicated that he has not had any problems with mood swings or depression. (Id.). Dr. Wessel's diagnosis was bipolar disorder. (Tr. 316). Dr. Wessel continued plaintiff on the Lithium, as well as BuSpar, Celexa, and Trazodone. (Tr. 315). Plaintiff also saw Dr. Parkinson for therapy. (Tr. 314). Plaintiff reported that, although he continues to have some "down" days, he feels that his "lows are not as low and don't last as long." (Id.). Plaintiff indicated that he was taking the steps necessary to get his driver's license reinstated so he could seek employment. (Id.). Plaintiff stated that he works for neighbors in the spring and summer. (Id.). Dr. Parkinson's diagnosis was depressive disorder. (Tr. 315).

Plaintiff saw Dr. Wessel on April 5, 2004, at which time plaintiff reported that he had experienced several episodes of depression which last a couple days. (Tr. 313). Dr. Wessel found that plaintiff's mood was not depressed and plaintiff was not suicidal. (Tr. 314). Dr. Wessel's diagnosis was bipolar disorder with history of depressive episodes. (Id.). Dr. Wessel continued plaintiff on his current medication regimen. (Id.). Plaintiff also saw Dr. Parkinson, who reported that plaintiff had taken some steps to facilitate his re-entering the work force. (Tr. 313). Dr. Parkinson stated that plaintiff's license was reinstated and plaintiff has been providing transportation for his neighbor on a regular basis, which has boosted plaintiff's self-esteem. (Id.). Plaintiff indicated that has been keeping busy by performing odd jobs, including maintaining his own five acres of land and mowing and planting trees for neighbors. (Id.).

Plaintiff saw Dr. Wessel on June 21, 2004. (Tr. 311). Dr. Wessel found that plaintiff's depression was under "very good control," except that plaintiff occasionally experiences depression and stays in bed. (Id.). Dr. Wessel described plaintiff's affect as "bright." (Id.). Dr. Wessel's diagnosis was chronic depression with bipolar disorder. (Id.). Dr. Wessel continued

plaintiff's current medication regimen. (Id.). Plaintiff saw Dr. Parkinson for therapy, at which time plaintiff reported that he was doing very well with the exception of one brief episode of intense depression. (Tr. 304). Plaintiff indicated that he feels better when he is doing something useful, such as yard work, mechanical work, and odd jobs. (Id.). Plaintiff discussed starting a lawn care business with a friend. (Id.).

Plaintiff also saw Dr. Sadiq on June 21, 2004, for a follow-up of hyperlipidemia[21] and arthralgia.[22] (Tr. 305). Dr. Sadiq stated that a CT scan showed degenerative changes with osteophytosis[23] with no evidence of herniation, and no acute abnormality. (Id.). Dr. Sadiq noted that lumbosacral spine x-rays also did not show any spondylosis[24] or spondylolisthesis.[25] (Id.). Dr. Sadiq stated that x-rays did not reveal any findings that would indicate the need for any surgical intervention. (Id.). Dr. Sadiq continued plaintiff on Naprosyn, muscle relaxant, and analgesic ointment, and counseled plaintiff on following a diet with low lipid content. (Tr. 306).

Plaintiff saw Dr. Parkinson on August 5, 2004, at which time plaintiff reported that he was doing well with stable mood and no periods of intense depression. (Tr. 304). Plaintiff indicated that he has been feeling better about himself since he has been doing more light mechanical work

---

[21]The presence of an abnormally high concentration of lipids in the circulating blood. Stedman's at 1019.

[22]Pain in a joint, especially one not inflammatory in character. Stedman's at 149.

[23]A bony outgrowth or protuberance. Stedman's at 1285.

[24]Ankylosis of the vertebra; often applied nonspecifically to any lesion of the spine of a degenerative nature. Stedman's at 1678. Ankylosis is the stiffening or fixation of a joint as the result of a disease process, with fibrous or bony union across the joint. Id. at 90.

[25]Forward movement of the body of one of the lower lumbar vertebrae on the vertebra below it or upon the sacrum. Stedman's at 1678.

and yard work.  (Id.).  Dr. Parkinson encouraged plaintiff to consider self-employment options.

(Id.).  Plaintiff discussed going into business with his friend doing yard work.  (Id.).  Dr.

Parkinson stated that plaintiff has worked through much of the anger with regard to his father's

death.  (Id.).  Dr. Parkinson noted that plaintiff continues to work hard in therapy and is making

good progress.  (Id.).

Plaintiff saw Satish C. Agarwal at the VA Medical Center on September 13, 2004.  (Tr.

303).  Plaintiff reported that he continues to experience up and down moods.  (Tr. 302).  He

indicated that he experienced an episode two to three weeks ago when he felt really depressed and

wanted to stay in bed for a few days.  (Id.).  Plaintiff reported that he continues to experience

suicidal feelings in the back of his head although he denies any suicidal intent or plan.  (Id.).  Dr.

Agarwal's diagnosis was chronic depression with bipolar disorder.  (Id.).  Dr. Agarwal continued

plaintiff's medication regimen and recommended that plaintiff continue therapy with Dr.

Parkinson.  (Id.).  Dr. Agarwal also discussed hospitalization with plaintiff and plaintiff declined.

(Id.).

Plaintiff also saw Dr. Parkinson for therapy on September 13, 2004.  (Tr. 301).  Plaintiff

stated that his mood has been fairly stable in general since his last visit, although he experienced a

two to three day period of severe depression during which he had suicidal thoughts.  (Id.).

Plaintiff reported that he was able to force himself to stay busy during this time by doing lawn

work and fixing an air conditioner.  (Id.).  Plaintiff stated that he would seek work if his disability

claim was denied.  (Id.).  Plaintiff denied suicidal ideation and indicated that he would seek help

voluntarily as he has in the past if he felt that his suicidal thoughts were progressing.  (Id.).  Dr.

Parkinson noted that plaintiff has not made any suicidal gestures or attempts since he quit drinking

alcohol in August 2002. (Id.).

## The ALJ's Determination

The ALJ made the following findings:

1.  The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through the date of this decision. The claimant filed an application for Disability Insurance Benefits on March 3, 2003. On February 24, 2003 he submitted a claim for Supplemental Security Income payments.

2.  The claimant suffers from mild depression, status post cervical spine fracture and neck pain that are severe impairments. He does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations Number 4.

3.  Based on a thorough analysis of all the evidence the undersigned finds that the claimant has the residual functional capacity to perform no more than light work activity that involves standing and walking six hours out of an eight hour workday and sitting at least six hours in an eight-hour wok day and lifting and carrying 20 pounds occasionally and 10 pounds frequently. Additionally, the claimant has mild limitations with concentration, attention, understanding and memory.

4.  The claimant's allegations of disabling pain and limitations, when considered pursuant to the law of the Ninth Circuit Court of appeals, Social security Ruling 96-7p, and the pertinent regulations, are not credible and are rejected for the reasons stated in the rationale portion of this decision which are incorporated by reference herein.

5.  The claimant has past relevant work experience as a wrecker operator, gas delivery driver, fleet mechanic, wood floor plank worker and plasma sprayer.

6.  Although the claimant has no past relevant work experience, he is capable of making an adjustment to work which exists in significant numbers in the national economy. Such work includes performing the following light unskilled jobs: scale operator (1,300 such jobs exist in the local economy and 149,000 such jobs exist in the national economy) and marking clerk (2,300 such jobs exist in the local economy and 279,000 such jobs exist in the national economy).

7.  The claimant was not under a "disability" as defined in the Social Security Act at any time through the date of the decision.

(Tr. 22).

    The ALJ's final decision reads as follows:

    It is the decision of the Administrative Law Judge that, based upon the application filed on
    March 3, 2003, the claimant is not entitled to a period of disability and Disability
    Insurance Benefits, under Sections 216(I) and 223, respectively, of the Social Security
    Act.

    It is the further decision of the Administrative Law Judge that, based on the application
    filed on February 24, 2003, the claimant is not eligible for Supplemental Security Income
    payments under Sections 1602 and 1614(a)(3)(A) of the Social Security Act.

(Tr. 23).


**Discussion**

A.    **Standard of Review**

    Judicial review of a decision to deny Social Security benefits is limited and deferential to

the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA

will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel,

222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough

that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v.

Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two

inconsistent positions from the evidence and one of those positions represents the Commissioner's

findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th

Cir. 1992).   The reviewing court, however, must consider both evidence that supports and

evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015,

1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court

must also take into consideration the weight of the evidence in the record and apply a balancing

- 18 -

test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry." Id.

**B.      The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c), 416.920 (c). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial

- 19 -

gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in

Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or

equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See

20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the

next step which inquires into whether the impairment prevents the claimant from performing his

or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform

the previous work, in consideration of the claimant's residual functional capacity (RFC) and the

physical and mental demands of the past work, the claimant is not disabled.

See id.  If the claimant cannot perform his or her previous work, the final step involves a

determination of whether the claimant is able to perform other work in the national economy

taking into consideration the claimant's residual functional capacity, age, education and work

experience.  See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability

benefits only if s/he is not able to perform any other work.  See id.  Throughout this process, the

burden remains upon the claimant until s/he adequately demonstrates an inability to perform

previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's

ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

    The Commissioner has supplemented this five-step process for the evaluation of claimants

with mental impairments.  See 20 C.F.R. §§ 404.1520a (a), 416.920a (a).  A special procedure

must be followed at each level of administrative review.  See id.  Previously, a standard document

entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this

special procedure, had to be completed at each level and a copy had to be attached to the ALJ's

decision, although this is no longer required.  See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e),

416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758 (2000).  Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council.  See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a.  The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists.  See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1).  If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2).  The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace.  See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3).  Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities.  See id.  Next, the Commissioner must determine the severity of the impairment based on those ratings.  See 20 C.F.R. §§ 404.1520a (c), 416.920a (c).  If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder.  See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).  This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders.  See id.  If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment.  See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3); Jones v.

Callahan, 122 F.3d 1148, 1153 n.5 (8th Cir. 1997).

**C.      Plaintiff's Claims on Appeal**

Plaintiff raises three claims on appeal of the Commissioner's decision.  Plaintiff first argues that the ALJ erred in determining that plaintiff's impairments do not meet or equal a Listing. Plaintiff next argues that the ALJ erred in assessing plaintiff's residual functional capacity. Plaintiff finally argues that the ALJ erred in concluding, based upon the testimony of the vocational expert, that plaintiff is capable of preforming light work.

**1.      Listed Impairments**

Plaintiff first argues that the ALJ erred in finding that plaintiffs impairments did not meet a listed impairment.  Specifically, plaintiff contends that the ALJ's finding that plaintiff did not meet listing 1.04, Disorders of the Spine, or listing 12.04, Affective Disorders, is not supported by substantial evidence.  Defendant argues that the ALJ properly determined that plaintiff did not meet a listed impairment.

The burden of proof is on the plaintiff to establish that his or her impairment meets or equals a listing.  Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004).  To meet a listing, an impairment must meet all of the listing's specified criteria.  Id.  An impairment that manifests only some of these criteria, no matter how severely, does not qualify.  Id.  (quoting Sullivan v. Zebley, 493 U.S. 521, 530-31, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990)).  Although it is preferable that ALJs address a specific listing, failure to do so is not reversible error if the record supports the overall conclusion.  Pepper ex rel Gardner v. Barnhart, 342 F.3d 853, 855 (8th Cir. 2003).

Plaintiff first argues that plaintiff's impairments meet listing 1.04, Disorders of the Spine. Listing 1.04 provides as follows:

*Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord With....

20 C.F.R. pt 404, subpt. P, app. 1, § 1.04.

The ALJ did not specifically discuss listings 1.04 or 12.04. The ALJ found, however, that plaintiff's condition was not severe enough to meet the requirements of any listing. (Tr. 18). The ALJ's determination is supported by the objective medical record. With respect to plaintiff's back impairment, plaintiff's condition does not meet listing 1.04 because he does not have compromise of the nerve root or the spinal cord. Plaintiff sustained a C5 fracture in July 2002 after being involved in an automobile accident, which was repaired surgically. (Tr. 177, 229). Although plaintiff complained of low back pain that radiated down his left lower extremity on December 31, 2003, Dr. Sadiq found that plaintiff's physical and neuromuscular examinations were negative. (Tr. 320). Dr. Sadiq stated that plaintiff's CT scan of the lumbosacral spine was also "entirely negative." (Id.). Dr. Sadiq expressed the opinion that plaintiff's symptoms were related to anxiety and "his desire to be declared disabled." (Id.). Plaintiff underwent additional x-rays on June 21, 2004, which revealed degenerative changes with osteophytosis but no evidence of herniation, and no acute abnormality. (Tr. 305). Dr. Sadiq also noted that no evidence of spondylosis or spondylolisthesis was found and plaintiff's condition did not require any surgical intervention. (Id.). Thus, plaintiff's back condition does not meet listing 1.04 because there is no evidence in the objective medical record of compromise of the nerve root or the spinal cord.

With respect to plaintiff's mental impairments, plaintiff's condition fails to meet the requirements of listing 12.04. Listing 12.04 provides, in relevant part, as follows:

*Affective Disorders:* Characterized by a disturbance of mood, accompanied by a full or

partial manic or depressive syndrome.  Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

        The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

  A.  Medically documented persistence, either continuous or intermittent, of one of the following:

  1.  Depressive syndrome characterized by at least four of the following:

  ....

AND

B.  Resulting in at least two of the following:

1.  Marked restriction of activities of daily living; or

2.  Marked difficulties in maintaining social functioning; or

3.  Marked difficulties in maintaining concentration, persistence, or pace; or

4.  Repeated episodes of decompensation, each of extended duration;

OR

C.  Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1.  Repeated episodes of decompensation, each of extended duration; or

2.  A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3.  Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. pt 404, subpt. P, app. 1, § 12.04.

Plaintiff was diagnosed and treated with depression and bipolar disorder.  As such, plaintiff's condition likely meets the criteria of section A for listing 12.04.  The medical record also reveals several psychiatric hospital admissions due to suicidal thoughts, which would qualify as episodes of decompensation.  The record does not, however, contain any evidence of restricted activities of daily living or social functioning, which are required to satisfy 12.04B and 12.04C.  In fact, plaintiff testified that he performs all of his normal activities of daily living, including cooking, cleaning, and driving, and the medical record reveals that plaintiff frequently socializes with neighbors and friends.  As such, the ALJ did not err in finding that plaintiff's mental

impairments did not meet or equal Listing 12.04.

Accordingly, the undersigned recommends that the decision of the Commissioner denying plaintiff's benefits be affirmed as to this point.

## 2. Residual Functional Capacity

Plaintiff argues that the ALJ erred in assessing plaintiff's residual functional capacity. Specifically, plaintiff contends that the ALJ erred in concluding that plaintiff's depression results in only mild limitations in concentration, attention, understanding, and memory. The undersigned agrees.

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogemeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Similarly, in making a finding of residual functional capacity, an ALJ may consider non-medical evidence, although the residual functional capacity finding must be supported by *some* medical evidence. See Lauer, 245 F.3d at 703.

In the instant case, the undersigned finds that the ALJ's assessment of residual functional capacity is not supported by substantial evidence. The ALJ assessed the following residual functional capacity:

the undersigned finds that the claimant has the residual functional capacity to perform no more than light work activity that involves standing and walking six hours out of an eight hour workday and sitting at least six hours in an eight-hour work day and lifting and carrying 20 pounds occasionally and 10 pounds frequently. Additionally, the claimant has mild limitations with concentration, attention, understanding and memory.

(Tr. 20). The ALJ provided no medical support for his mental residual functional capacity assessment.

The only medical evidence in the record that is consistent with the ALJ's mental residual functional capacity determination is the opinion of the non-examining state agency medical consultant, Dr. Toll, who based her opinion upon a review of plaintiff's medical records. (Tr. 247-58). "The opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (quoting Kelley, 133 F.3d at 589). Dr. Toll found that plaintiff's mental impairments caused mild limitations in plaintiff's activities of daily living; ability to maintain social functioning; and ability to maintain concentration, persistence, or pace. (Tr. 255). Dr. Toll indicated that her opinion was based largely upon the fact that plaintiff was not taking any medication or seeking treatment for psychiatric problems at that time. (Tr. 257). Dr. Toll's provided her opinion in March of 2003. Plaintiff, however, sought psychiatric treatment at the VA Medical Center, including medication and therapy, from May 2003 to September 2004.

The record reveals that plaintiff presented to Dr. Neira at the VA Medical Center on May 7, 2003, complaining of depression that had worsened since he stopped treatment six months prior to his visit. (Tr. 277). Dr. Neira diagnosed plaintiff with recurring major depression. (Id.). Dr. Neira prescribed Celexa, Trazodone, and Buspar, and referred plaintiff to psychotherapy. (Id.). Plaintiff saw Dr. Neira and other psychiatrists at the VA Medical Center regularly for

follow-ups and medication adjustments. Plaintiff also saw Dr. Parkinson for individual therapy. Dr. Neira initially reported that plaintiff was tolerating his medications well and was feeling better. (Tr. 276).

On November 18, 2003, plaintiff reported to Dr. Parkinson that his depression had been severe the prior three weeks. (Tr. 331). On January 9, 2003, plaintiff reported to Dr. Wessel that he was feeling very depressed and had been experiencing mood swings. (Tr. 317). Dr. Wessel diagnosed plaintiff with bipolar disorder with major depression, and started plaintiff on Lithium. (Id.). On February 4, 2004, Dr. Wessel reported that plaintiff's condition had improved since starting the Lithium. (Tr. 316). On April 5, 2004, and on June 21, 2004, plaintiff reported experiencing several episodes of severe depression lasting a couple days, in which he stays in bed all day. (Tr. 313, 311). On September 13, 2004, plaintiff reported that he continues to experience mood swings and episodes of severe depression. (Tr. 303). Plaintiff also indicated that he continues to experience suicidal thoughts. (Tr. 301-02). Dr. Agarwal recommended hospitalization, which plaintiff declined. (Tr. 302).

The ALJ's residual functional capacity determination did not accurately take into account plaintiff's mental impairments. The ALJ did not even acknowledge Dr. Wessel's diagnosis of bipolar disorder. The ALJ did not mention that plaintiff is taking several strong psychotropic medications, including Celexa, Trazodone, Buspar, and Lithium. Although plaintiff's condition initially improved after beginning these medications, plaintiff continued to experience episodes of severe depression. On September 13, 2004, the last psychiatric visit contained in the record, plaintiff reported experiencing episodes of severe depression, which included suicidal thoughts. (Tr. 302). Dr. Agarwal recommended psychiatric hospitalization at this time. (Id.). The record

reveals that plaintiff had attempted suicide on several other occasions, which resulted in psychiatric hospital admissions. The ALJ's determination that plaintiff's mental impairments cause only "mild limitations with concentration, attention, understanding and memory" is simply not supported by the medical record.

Moreover, none of plaintiff's treating mental health processionals has offered an opinion regarding plaintiff's functional limitations or capacities. An ALJ has a duty to fully develop the record, particularly where a claimant is not represented by counsel. See Driggins v. Harris, 657 F.2d 187, 188 (8th Cir. 1981). This inquiry is limited to whether the claimant was prejudiced or unfairly treated by the ALJ's development of the record. See Onstad v. Shalala, 999 F.2d 1232, 1234 (8th Cir. 1993). A consultative examination may be ordered when "the evidence as a whole, both medical and nonmedical, is not sufficient to support a decision on [a claimant's] claim." See 20 C.F.R. §§ 404.1519a (b), 416.919a (b). It has been held to be reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision. See Haley v. Massanari, 258 F.3d 742, 749 (8th Cir. 2001). However, an "ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision." Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1999) (quoting Naber v. Shalala, 22 F.3d 186, 189 (8th Cir. 1994)).

As indicated above, an ALJ has a duty to obtain medical evidence that addresses the claimant's ability to function in the workplace. See Hutsell, 259 F.3d at 711-712. In this case, however, no medical evidence exists in the record that addresses plaintiff's mental functional capacity. Without medical evidence addressing plaintiff's ability to function in the workplace, the

ALJ cannot make an informed decision about plaintiff's functional restrictions. As explained above, due to this omission, the ALJ has assessed a residual functional capacity which is not based on substantial medical evidence in the record. The court therefore finds that plaintiff, who was unrepresented at the administrative hearing, has been prejudiced by the ALJ's failure to obtain further medical evidence addressing plaintiff's mental functional capacity.

Accordingly, the undersigned recommends that this matter be reversed and remanded to the ALJ in order for the ALJ to formulate a new mental residual functional capacity for plaintiff based on the medical evidence in the record, and to order, if needed, additional medical information addressing plaintiff's ability to function in the workplace in light of his mental impairments.

### 3. Vocational Expert Testimony

Plaintiff finally argues that the ALJ erred in finding, based upon the testimony of the vocational expert, that plaintiff is capable of performing light work. The undersigned has found that the ALJ erred in assessing plaintiff's mental residual functional capacity. The hypotheticals posed to the vocational expert were based upon this flawed residual functional capacity. Accordingly, the undersigned recommends that the decision of the Commissioner be reversed and this cause remanded in order for the ALJ to pose a new hypothetical based upon a proper mental residual functional capacity.

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner denying plaintiff's applications for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income benefits under Title XVI of the Act be **reversed** and this case be **remanded** to the Commissioner for further proceedings consistent with this Report and Recommendation.

The parties are advised that they have eleven (11) days, until September 4, 2006, to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

Dated this 22nd day of August, 2006.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE